**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-137-RC** |
| **BRIAN GUNDERSEN,** | |
| **Defendant.** | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this response to defendant Brian Gundersen's Memorandum in Aid of Sentencing, which was filed under seal.[1] Gundersen objects to the PSI's imposition of the eight-level enhancement under § 2J1.2(b)(1)(B) and to the three-level enhancement under § 2J1.2(b)(2). Gundersen asks the court to depart from its own reasoning,[2] and the reasoning of all but two judges of this district, to find that these enhancements are inapplicable as a matter of law because Congress's certification of the election on January 6 did not involve the "administration of justice," citing Judge McFadden's reasoning in *United States v. Seefried*, 21-cr-287. Gundersen's objection should be overruled because the enhancements apply both legally and factually.

Gundersen also objects to the PSR's determination that his assault was an "aggravated

---

[1] The Court's docket does not indicate that Gundersen filed a motion for leave to file his sentencing memorandum under seal. While the government does not object to the redaction of healthcare records, the government does object to a blanket sealing of defendant's entire sentencing submission.

[2] In footnote 2 of his memo, Defendant states that this Court applied both enhancements in *United States v. Reffit*, 21-cr-32 (DLF), but that case was before Judge Friedrich, not this Court..

assault" requiring the use of §2A2.2 to calculate his offense level on Count Two, rendering him eligible for a six-level enhancement for attacking an official victim. As discussed below, Gundersen's objections have no merit.

**A.      THE SECTION 2J1.2(b) ENHANCEMENTS APPLY**

**1.      The certification of the Electoral College vote involved the administration of justice as defined broadly in the Guidelines.**

Section 2J1.2, entitled "Obstruction of Justice," applies to a variety of obstruction offenses, including all offenses under § 1512 and under 11 other statutes found in Chapter 73 of Title 18. *See* U.S.S.G. § 2J1.2 cmt.; U.S.S.G. Appendix A. It provides for an eight-level increase if the offense involved causing or threatening injury to a person or damage to property "in order to obstruct the administration of justice." U.S.S.G. § 2J1.2(b)(1)(B). It also provides for a three-level increase "if the offense resulted in substantial interference with the administration of justice." U.S.S.G. § 2J1.2(b)(2).

Section 2J1.2's text, purpose, and commentary all demonstrate that conduct that obstructs Congress's certification of the Electoral College vote interferes with the "administration of justice" for purposes of the guideline. Administration of justice, in its broadest sense, refers to the proper administration of law by all three branches of government. Black's Law Dictionary defines "justice" to include "[t]he fair and proper administration of laws," and it defines "obstruction of justice" as "[i]nterference with the orderly administration of law and justice." Black's Law Dictionary (11th ed. 2019); *see* Ballentine's Law Dictionary 696 (3d ed. 1969) (defining justice to include "exact conformity to some obligatory law"). When defining "contempt" to include "[c]onduct that defies the authority or dignity of a court *or legislature*," Black's Law Dictionary observes that "such conduct interferes with the administration of justice." Black's Law Dictionary

(11th ed. 2019) (emphasis added). And courts have defined "administration of justice" to mean "the performance of acts or duties required by law," *Rosner v. United States*, 10 F.2d 675, 676 (2d Cir. 1926) (quotation omitted), or "the performance of acts required by law in the discharge of duties," *United States v. Partin*, 552 F.2d 621, 641 (5th Cir. 1977).

To be sure, the term "administration of justice" is more commonly used in a narrower sense to refer to "interference with the pendency of some sort of judicial proceedings." *In re Kendall*, 712 F.3d 814, 828 (3d Cir. 2013); *see In re McConnell*, 370 U.S. 230, 234, 236 (1962) (defining the term in the contempt context as relating to "the performance of judicial duty"); *United States v. Aguilar*, 515 U.S. 593 (1995) (stating that the "omnibus clause" of 18 U.S.C. § 1503, which criminalizes obstruction of the "due administration of justice," requires proof of "an intent to influence judicial or grand jury proceedings"). But there are compelling reasons for concluding that "administration of justice" bears its broader (albeit less common) meaning in U.S.S.G. § 2J1.2.

First, § 2J1.2's context and purpose support the broader reading of "administration of justice" in both (b)(2) and (b)(1)(B). Section 2J1.2 applies to an array of obstruction statutes, including a number that do *not* involve the "administration of justice" in the narrow sense (i.e., relating to judicial or quasi-judicial proceedings). *See* U.S.S.G. § 2J1.2 cmt. (listing covered statutes); U.S.S.G. Appendix A (statutory index). Those offenses include concealing or destroying invoices or papers relating to imported merchandise, 18 U.S.C. §§ 551; obstructing an investigation under the Workforce Innovation and Opportunity Act, 18 U.S.C. § 665(c); obstruction of proceedings before departments, agencies, and committees, 18 U.S.C. § 1505; obstruction of enforcement of state gambling laws, 18 U.S.C. § 1511; obstruction of official proceedings, 18 U.S.C. 1512; obstruction of a federal audit, 18 U.S.C. § 1516; destruction of

3

documents in agency investigations, 18 U.S.C. § 1519; and interfering with the administration of the Internal Revenue Code, 26 U.S.C. § 7212. Yet under a narrow interpretation of the guideline, the enhancements under §§ 2J1.2(b)(1)(B) and (b)(2) would not apply to those statutes. That is good reason to reject such a reading. *Cf. United States v. Castleman*, 572 U.S. 572 U.S. 157, 167 (2014) (rejecting a reading of 18 U.S.C. § 922(g)(9) that "would have rendered [it] inoperative in many States at the time of its enactment").

Section 2J1.2's background indicates that the Sentencing Commission intended the enhancements to reach the type of violent and dangerous conduct at issue in this case. The background notes that § 2J1.2 broadly covers crimes "of varying seriousness," including offenses that involve intercepting grand jury deliberations, interfering with an illegal gambling investigation, or obstructing "a civil or administrative proceeding," and that the underlying conduct may "range from a mere threat to an act of extreme violence." U.S.S.G. § 2J1.2 cmt. Background. Within that range, the enhancements "reflect the more serious forms of obstruction." *Id.* The Commission thus crafted the enhancements in § 2J1.2 to cover the most egregious *conduct* in the full knowledge that obstruction-of-justice offenses are not limited solely to interference with judicial proceedings.

Relatedly, limiting subsection (b)(1)(B)'s and (b)(2)'s enhancements to obstruction of judicial proceedings would undermine the purpose of the Guidelines. "A principal purpose of the Sentencing Guidelines is to promote uniformity in sentencing imposed by different federal courts for similar criminal conduct." *Hughes v. United States*, 138 S. Ct. 1765, 1774 (2018). The Guidelines therefore seek to achieve "a strong connection between the sentence imposed and the offender's real conduct." *United States v. Booker*, 543 U.S. 220, 246 (2005). The Sentencing

Commission quite reasonably determined, for example, that "causing or threatening physical injury to a person, or property damage, in order to obstruct the administration of justice" is more serious than obstruction not involving such injury or threats and should be punished more severely. U.S.S.G. § 2J1.2(b)(1)(B). And the seriousness of the threatening or injurious conduct does not depend on whether the obstructed proceeding is judicial, legislative, or executive. There is no sound basis for assigning a significantly higher offense level to someone who violently interferes with a court proceeding than someone who violently interferes with a congressional proceeding. *See United States v. Rubenacker,* 21-cr-193 (BAH), May 26, 2022 Sentencing Hearing Tr. at 69 ("There is simply no indication in guideline Section 2J1.2 that the [specific offense characteristics] containing the phrase 'administration of justice' were meant to apply to only some of the statutes referenced to this guideline and not to apply to all of the cases involving obstruction of proceedings taking place outside of courts or grand juries; that simply doesn't make sense.")

This is especially true considering that subsections (b)(1)(B) and (b)(2) are not simply two factors among many but are the key sentencing factors in most obstruction cases. The three other enhancements in § 2J1.2 have limited application. Subsections (b)(1)(A) and (b)(1)(c) apply only to violations of § 1001 and § 1505 relating to sex or terrorism offenses. And subsection (b)(3), a comparatively minor two-level increase, applies only where a document was destroyed or altered or the offense was "extensive in scope, planning, or preparation." U.S.S.G. § 2J1.2(b)(3). Reading the enhancements in subsection (b)(1)(B) and (b)(2) as applying only to judicial or quasi-judicial proceedings would fail to distinguish between the seriousness of offenders' conduct in a wide variety of obstruction offenses covered by § 2J1.2. On the other hand, reading the term "administration of justice" more broadly eliminates this gap in the guideline.

Second, Section 2J1.2's commentary provides a broad definition of "administration of justice." It defines "[s]ubstantial interference with the administration of justice" to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; or *the unnecessary expenditure of substantial governmental or court resources*." U.S.S.G. § 2J1.2 cmt. n.1 (emphasis added). This definition includes interference not only with "court" resources, but also with any "governmental" resources, a term that includes congressional resources. The Supreme Court has held that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993). Because this commentary is consistent with the plain text of the Guideline, which uses the broad term "administration of justice," it is authoritative.

To be sure, the commentary defines only the term "substantial interference with the administration of justice," which serves as the basis for the three-point enhancement in U.S.S.G. § 2J1.2(b)(2) and does not specifically define the term "in order to obstruct the administration of justice," which serves as the basis for the eight-point enhancement in U.S.S.G. § 2J1.2(b)(1)(B). But the relevant term "administration of justice" is identical and should be given the same interpretation in both enhancements. The operative verbs "interfere[]" and "obstruct" carry the same meaning in this context. And the adjective "substantial" in § 2J1.2(b) does not change the meaning of "administration of justice," especially since the commentary repeats the word, requiring "the unnecessary expenditure of *substantial* governmental . . . resources."   U.S.S.G. § 2J1.2 cmt. n.1 (emphasis added). Thus, the term "in order to obstruct the administration of justice"

in U.S.S.G. § 2J1.2(b)(1)(B) should be read to include obstructive conduct aimed at nonjudicial governmental activities. A different conclusion would lead to the incongruous result of giving two different meanings to the term "administration of justice" within the same guideline. *See Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning.").

Obstruction of the Electoral College certification vote on January 6, 2021 falls comfortably within the meaning of "administration of justice" as used in § 2J1.2 because it involved Congress's performance of duties required by law. Specifically, Congress's certification of the Electoral College vote was an official proceeding required by both the Constitution and federal statutes.[3] *See* U.S. Const. art. II, § 1, cl. 3; 3 U.S.C. §§ 15-18. Application of both subsections (b)(1)(B) and (b)(2) is therefore appropriate here.

**2.    Courts in other January 6 cases, including this Court, have correctly held that non-judicial proceedings can involve the administration of justice.**

Other courts, including this one, have appropriately applied the "administration of justice" enhancements in U.S.S.G. § 2J1.2(b)(2) to efforts to obstruct a wide range of proceedings that were not limited to judicial or grand jury proceedings. *See United States v. Ali*, 864 F.3d 573, 574

---

[3] Chief Judge Howell has articulated a different basis on which to apply the enhancement to obstruction of the Electoral College certification. *United States v. Rubenacker*, 21-cr-193 (BAH), Sentencing Hearing Tr. at 69. She pointed out that Black's Law Dictionary defines "administration of justice" to include the "maintenance of right within a political community by means of the physical force of the state," Black's Law Dictionary (11th ed. 2019), and observed that the joint session of Congress used "'the physical force of the state' in the form of law enforcement officers located in and around the Capitol to secure the proceedings." *Rubenacker*, Sentencing Tr. at 75. This understanding of the guideline is arguably broader than the interpretation advanced by the government because it could apply to any proceeding (or event) at which there was a police presence, rather than being limited to proceedings involving the administration of the law.

(7th Cir. 2017) (upholding the application of § 2J1.2(b)(2) after law enforcement officials expended substantial resources to recover the defendant's children he kidnapped and transported internationally); *United States v. Atlantic States Cast Iron Pipe Co.*, 627 F. Supp. 2d 180, 205-08 (D.N.J. 2009) (applying § 2J1.2(b)(2) after a defendant interfered with OSHA investigations into a workplace accident); *United States v. Weissman*, 22 F. Supp. 2d 187, 194-98 (S.D.N.Y. 1998) (applying § 2J1.2(b)(2) after a defendant withheld subpoenaed documents from a congressional subcommittee).

In the specific context of January 6, this Court has applied § 2J1.2's "administration of justice" enhancements in *United States v. Andries*, 21-cr-93 (RC) and recently in *United States v. Fitzsimons*, 21-cr-158 (RC). Consistent with these sentencing calculations, other courts have applied § 2J1.2's "administration of justice" enhancements in cases arising from the Capitol breach on January 6, both in cases where the parties agreed to their application and where the application was contested. *See, e.g.*, *United States v. Hodgkins*, No. 21-cr-188 (Moss, J.); *United States v. Fairlamb*, No. 21-cr-120 (Lamberth, J.); *United States v. Chansley*, No. 21-cr-003, (Lamberth, J.); *United States v. Matthew Miller*, No. 21-cr-075 (Moss, J.) (uncontested, but independently addressed by the Court); *United States v. Rubenacker*, No. 21-cr-193 (Howell, J.) (contested); *United States v. Pruitt,* No. 21-cr-23 (Kelly, J.); *United States v. Robertson,* 21-cr-34 (Cooper, J.) (contested).

### 3.    Judge McFadden's contrary conclusion in *Seefried* is unpersuasive.

In *United States v. Seefried*, Judge McFadden reached a contrary conclusion, finding that "administration of justice" in § 2J1.2 is limited to "a judicial or related proceeding that determines rights or obligations." *United States v. Seefried*, No. 21-cr-287, Doc. 123, at 1 (D.D.C. Oct. 29,

2022) (TNM). Judge McFadden's reasons for reaching that conclusion, however, are not persuasive.

Judge McFadden first discussed Black's Law Dictionary's definitions of "administration of justice" and "due administration of justice," which, he concluded, "suggest that the 'administration of justice' involves a judicial or quasi-judicial tribunal that applies the force of the state to determine legal rights." *Seefried*, Doc. 123 at 4. He also considered that dictionary's definition of "obstructing" and "interfering with" the administration of justice, a definition that he determined "further corroborates that the 'administration of justice' involves something like a legal proceeding, such as a trial or grand jury hearing." *Id.* at 5. But Judge McFadden did not consider the broader definitions of "justice" and "obstruction of justice" cited above, which relate to the orderly administration of the law more generally. Indeed, Black's Law Dictionary recognizes that "[c]onduct that defies the authority or dignity of a court *or legislature* . . . . interferes with the administration of justice." Black's Law Dictionary (11th ed. 2019) (emphasis added).

Nor does Judge McFadden's corpus linguistics analysis support a different result. Surveying a representative sampling of 375 uses of the term "administration of justice" in legal usage between 1977 and 1987, Judge McFadden found that about 65% of the hits referred to "a judicial proceeding deciding legal rights," about 4% involved "law enforcement activities," and only three entries "referr[ed] to government function generally." *Seefried*, Doc. 123 at 11-13. But the simple fact that the term *usually* bears judicial connotations does not mean that it *must*, particularly where, as here, the guideline's context, purpose, and commentary point in a different direction. Like all words, legal terms often bear multiple meanings. For example, the term "suppression of evidence" can refer either to a court's exclusion of evidence from trial or to the

prosecution's withholding of favorable evidence from the defense. Which meaning the term bears in a particular instance cannot be determined by the frequency of each meaning within the legal corpus. And in this case, the frequent use of other meanings is no reason to reject a broader meaning of "administration of justice" that gives full effect to the guideline and corresponds with the commentary's definition.

Judge McFadden was also incorrect in his analysis of § 2J1.2's commentary. *Seefried*, Doc. 123 at 14-17. As an initial matter, he questioned whether the commentary was even "authoritative," pointing out that the D.C. Circuit "has suggested that courts should eschew deference to the Commission when the commentary expands the meaning of the text of the Guidelines themselves." *Id.* at 14 (citing *United States v. Winstead*, 890 F.3d 1082, 1092 (D.C. Cir. 2018)). But *Winstead* involved a very different situation, in which the guideline's text included a specific list of crimes defined as "controlled substance offenses" and the commentary added an additional *attempt* crime that was "not included in the guideline." *Winstead*, 890 F.3d at 403. The D.C. Circuit held that "[b]y purporting to add attempted offenses to the clear textual definition," rather than "interpret[ing] or explain[ing] the ones already there," the commentary conflicted with the guideline and was not authoritative under *Stinson*. *Id.* at 404. Here, by contrast, the commentary does not attempt to add to a finite list of offenses, but rather "explain[s]" that the term "administration of justice" bears a broad meaning that includes non-judicial proceedings.

Nor was Judge McFadden correct that—even if it is binding—§ 2J1.2's commentary supports only "a narrower interpretation of the 'administration of justice.'" *Seefried*, Doc. 123 at 15. Although the other definitions in the commentary undoubtedly relate to "investigations, verdicts, and judicial determinations," that fact does not support a definition that excludes

congressional proceedings. The commentary's use of the word "includes" indicates that the definition is not an exhaustive list. *See* Antonin Scalia & Bryan A Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012). And the inclusion of the "premature or improper termination of a felony investigation" indicates that the definition applies to executive-branch investigations that are not yet before a grand jury or court.

Reading the commentary's use of the word "governmental . . . resources" to include congressional resources would not, as Judge McFadden concluded, "render[ ] the phrase 'or court' superfluous." *Seefried*, Doc. 123 at 17. Although a "broad definition" of "governmental" could "include court resources," *id.*, using both terms in an attempt to sweep in all three branches of government is hardly an obvious superfluity. The Sentencing Commission could have added the word "court" to clarify that the term "governmental" did not exclude courts. And the purported superfluity could be avoided by reading "governmental . . . resources" to refer to the resources of both the executive and legislative branches (as opposed to the judicial). The superfluity canon provides no basis to limit the term to "*prosecutorial* resources." *Id.* Moreover, Judge McFadden's interpretation of the commentary runs into its own superfluity problem. If, as he concluded, the term "administration of justice" in § 2J1.2 refers only to "a judicial or related proceeding," *id.* at 1, then the word "governmental" is itself superfluous. This reading should be rejected.

Judge McFadden's concern that a broader reading of "administration of justice" would allow the government to "trigger the enhancements at will" is also misplaced. *Seefried*, Doc. 123 at 16. The enhancements in § 2J1.2 do not apply whenever the offense "caused unnecessary expenditures of its resources" in some attenuated way, such as by causing the government to later bring a prosecution. *Id.* ("While the events of January 6 caused the Government to commit

significant resources—evidenced in part by the number of cases charged in this district—this argument proves too much."). Instead, the enhancement is best read as applying where the obstructive conduct itself—not the later prosecution of that conduct—caused the unnecessary expenditure of substantial governmental or court resources. *See United States v. Harrington*, 82 F.3d 83, 87 n.2 (5th Cir. 1996) (observing that the case resulted in the expenditure of "substantial resources . . . over and above the routine costs of prosecuting the obstruction offense"). If the enhancement could truly be triggered simply by "charg[ing]" a case, *Seefried*, Doc. 123 at 16, then even under Judge McFadden's reading the enhancement would apply every time the government brought a felony prosecution, which results in the expenditure of substantial "court" and "prosecutorial" resources, *id.* at 16-17. Judge McFadden's conclusion that "governmental" should be read to exclude Congress simply does not follow from his concerns about excessive application of the enhancements.

Judge McFadden was also incorrect in perceiving a conflict between the government's interpretation of "administration of justice" in § 2J1.2 and the same term in 18 U.S.C. § 1503, which contains a catchall provision prohibiting obstruction of "the due administration of justice." *See Seefried*, Doc. 123 at 5-6 (observing that the government had not charged any January 6 defendants under § 1503), 20-21 (saying it would be "incongruous" to conclude that "official proceeding" means something different in the Sentencing Guidelines than in the statutory context). The Supreme Court has made clear that a term can have a different meaning in the Sentencing Guidelines than it does in a statute. *DePierre v. United States*, 564 U.S. 70, 87 (2011). And there are at least three differences between § 1503 and § 2J1.2 that counsel in favor of reading them differently. First, unlike § 1503, § 2J1.2 includes its own definition of the "administration of

justice," which covers the expenditure of "governmental *or* court" resources. Second, § 1503 appears in the context of a statute that applies to jurors, court officers, and judges, which may favor a narrower reading of the catchall provision for interference with the "due administration of justice." And, third, § 2J1.2's entire purpose is to distinguish between levels of culpability for those who violate a wide variety of obstruction statutes, many of which are not limited to judicial or quasi-judicial proceedings.

Judge McFadden's reading of § 2J1.2 also creates difficult line-drawing problems. Under his reasoning, the enhancements in subsection (b)(1)(B) and (b)(2) apply only to offenses where the obstructed proceedings were "judicial" or "quasi-judicial" in nature. *Seefried*, Doc. 123 at 4. But those terms themselves raise difficult questions about how closely the obstructive conduct must "relate[]" to a judicial proceeding or what proceedings can be said to "determine[] rights or obligations." *Id.* at 1. For example, 18 U.S.C. § 1505 applies to obstruction of an investigation by the House Ethics Committee, which has the power to discipline current members of Congress. That inquiry would seem to be "quasi-judicial" and one that "determines rights or obligations," *id.* at 1, 4, yet it does not involve the "possibility of punishment by the state," *id.* at 4. The government's broader reading of "administration of justice," by contrast, would apply to all the obstruction offenses covered by § 2J1.2. Under the government's reading, therefore, a sentencing court need not answer difficult questions about whether a proceeding is sufficiently "judicial" or "quasi-judicial" to trigger subsections (b)(1)(B) and (b)(2).

Moreover, even under a narrower reading of administration of justice, the certification fits within the definition because it has quasi-judicial features. The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors

throughout the country in presidential election. 3 U.S.C. § 15. As in a courtroom, Members may

object, which in turn causes the Senate and House of Representatives to "withdraw" to their

respective chambers so each House can render "its decision" on the objection. *Id.* Congress's

certification of the Electoral College vote, moreover, must terminate with a decision: Congress

may not recess until "the count of electoral votes" is "completed," and the "result declared." 3

U.S.C. § 16. Indeed, for these reasons, several judges on this Court have concluded that Congress's

certification of the Electoral College is a "quasi-adjudicative or quasi-judicial" proceeding. *United*

*States v. Nordean*, 579 F. Supp. 3d 28, 43 (D.D.C. 2021); *see United States v. Robertson*, 588 F.

Supp. 3d 114, 121-22 (D.D.C. 2022) (holding that "the certification of the Electoral College vote

is quasi-adjudicatory"); *United States v. Caldwell*, 581 F. Supp. 3d 1, 14-15 (D.D.C. 2021)

(holding that the certification was "an 'adjudicatory' proceeding").

### 4. § 2J1.2(b)(1)(B) applies factually because Gundersen threatened physical injury.

On page 10 of his memo, Gundersen argues that the eight-level enhancement under

§ 2J1.1(b)(1)(B) does not apply to the facts of this case because his assault did not involve causing

or threatening physical injury to a person and was not done "in order to obstruct the administration

of justice." Neither argument has merit.

First, Gundersen has admitted that he "rushed MPD Officer C.B., hitting the officer with

his arm" and that he assaulted officer C.B. "with force and with physical contact." *See* ECF No.

44, ¶ 26, 40. Gundersen's assault was unsuccessful only because another officer pushed Gundersen

back using a riot shield. *Id*. ¶ 26. Moreover, the video evidence (Sentencing Exhibit 13) shows the

force with which Gundersen rushed MPD Officer C.B. and the impact of his assault. This conduct

clearly threatened physical injury to Officer C.B. Moreover, under §1B1.3, relevant conduct

includes not only the defendant's actions but those of others that he aided and abetted, or that were within the scope of jointly undertaken criminal activity and reasonably foreseeable to Gundersen. Gundersen has admitted that on January 6, he knew that others were committing obstruction of an official proceeding, and that he performed acts in furtherance of the offense "for the purpose of aiding, assisting, soliciting, facilitating, or encouraging others" in committing that offense. ECF No. 44, ¶ 39. Thus, Gundersen's relevant conduct includes the threats of physical injury by other rioters.

Contrary to the argument in his sentencing memo, Gundersen's later retreat into the crowd is irrelevant – the enhancement applies because of Gundersen's assault prior to his retreat. Similarly irrelevant is whether Officer C.B. was actually injured. The enhancement does not require physical injury to have actually occurred; it applies even where the Gundersen only *threatened* to cause physical injury. Further demonstrating that physical injury is not necessary, the guideline commentary states that an upward departure beyond the eight-level enhancement may be appropriate where the offense actually *did* result in bodily injury. *See* § 2J1.2, comment. n. 4.

Second, the evidence shows that Gundersen's assault was not an isolated event unrelated to his actions on January 6, but rather part and parcel of his efforts to obstruct the certification of the election. Gundersen has admitted that when he committed his assault, he knew the officer he assaulted was engaged in the performance of official duties. ECF No. 44, ¶ 40. There is no dispute about what those "official duties" were – the officers were clearing rioters such as Gundersen from the Capitol Grounds so that Congress could resume its duties. Gundersen's social media statements also make clear that he understood the violence on January 6 was not random, but rather was

directly connected to the attempt to overturn the election. Given his action of "bum rushing" Officer C.B., Gundersen's statement on January 7 that "we can check bum rushing the capitol building off the list of potential ways to take over the government" (ECF No. 54, at 15) is particularly relevant. Moreover, when referring to the violence of January 6, Gundersen did not refer to it as unexpected or unrelated to the election, but rather claimed it was "justified" and that he and his fellow rioters had to "resort to violence" because Congress didn't "listen" (ECF No. 54, at 16-17) demonstrating that he understood the violence was connected to the effort to overturn the election.

That Gundersen's assault occurred after he had been kicked out of the building (for the second time) is irrelevant. Gundersen had no idea at the time of his assault whether or not he would be successful in entering a third time, and his failure to re-enter is a result of the police efforts, not any lack of desire on his part. Moreover, Gundersen cites no authority that there must be a causal link between his assault and the outcome or duration of the certification proceedings. To the contrary, a motivation of vengeance or retaliation after the fact is also sufficient for the enhancement to apply. *See United States v. Duarte*, 28 F.3d 47 (7th Cir. 1994). In *Duarte*, the defendant threatened a witness after pleading guilty to the drug offense in which the witness would have testified. The defendant argued that because the witness would not be testifying, his threat could not have obstructed the administration of justice. *Id*. at 48. The Seventh Circuit disagreed, noting that the purpose of U.S.S.G. § 2J1.2(b)(1) is to distinguish threats of physical injury or property damage from "lesser threats," rather than to "introduce refined distinctions within the broad category of obstruction of justice." *Id.* Nor have any other courts in the January 6 cases limited the enhancement to physical assaults that preceded entry into the Capitol building.

The law is also clear that for a conviction, a defendant's unlawful purpose to obstruct justice need not be the defendant's "sole or primary" purpose. *See United States v. Smith*, 831 F.3d 1207, 1217-18 (9th Cir. 2016). As Chief Judge Howell instructed the jury in *United States v. Herrera*, No. 21-CR-619, "While the defendant must act with intent to obstruct the official proceeding, this need not be his sole purpose. A defendant's unlawful intent to obstruct justice is not negated by the simultaneous presence of another purpose for his conduct." *Herrera*, ECF No. 65, at 7. Thus, even though there is no evidence to support it, even if Gundersen had some additional purpose in assaulting Officer C.B., the enhancement would still apply.[4]

Finally, the enhancement under § 2J1.2(b)(1)(B) applies not only to physical injury but also to property damage. Gundersen was among the smaller group of rioters who entered into the Parliamentarian's Office while it was being ransacked. Indeed, Gundersen has admitted that while in this office, he saw rioters ransacking the room, wrecking furniture, stealing, and throwing papers to the floor. ECF No. 44, ¶ 17. Sentencing Exhibits 6 and 7 show Gundersen's presence in the room and the damage caused by the rioters. And Gundersen recognized his shared responsibility for this damage through his note expressing mock remorse. ECF No. 44, ¶ 19.

The purpose of this property damage was clear – it was an effort by the mob to assert dominance and control over the Capitol, and to intimidate its occupants. The commentary to § 2J1.2 states that inclusion of "property damage" under subsection (b)(1)(B) is designed to

---

[4] The government also notes that if, for any reason, this enhancement is not applied, then the basis for grouping Defendant's convictions (PSR ¶ 60) would no longer apply, and Defendant's guideline range would need to be recalculated, with each of Defendant's convictions constituting a separate group and a combined offense level being calculated pursuant to U.S.S.G. § 3D1.4

address precisely this kind of property damage caused as a means of intimidation or retaliation. *See* U.S.S.G. § 2J1.2, cmt. n. 5.

**5.** **§ 2J1.2(b)(2) applies factually because Gundersen's offense resulted in substantial interference with the certification of the election.**

Similarly, the three-level enhancement of § 2J1.2(b)(2) applies to the Gundersen's conduct. Gundersen willfully and knowingly joined a mob to obstruct congressional proceedings. While Gundersen alone could not have created the same degree of chase and disruption, a mob cannot exist without its individual members. As noted, under § 1B1.3, Gundersen's relevant conduct includes the foreseeable acts of other rioters, and Gundersen has admitted that he committed acts "for the purposes of aiding, assisting, soliciting, facilitating, or encouraging others" to obstruct the official proceeding. ECF No. 44, ¶ 39. Moreover, Gundersen was an active participant in the breach, not only entering the Capitol twice, but encouraging others to enter the building, leaving a note conveying mock remorse, and assaulting an officer.

Gundersen's presence as part of the mob had a direct causal relationship with the delay of the certification. Each time Gundersen entered the Capitol, he did so with no security screening or weapons check. Congressional proceedings could not resume until every unauthorized occupant had left the Capitol and the building had been confirmed secured.

The commentary also defines "[s]ubstantial interference with the administration of justice" to include "the unnecessary expenditure of substantial governmental or court resources." U.S.S.G. § 2J1.2, cmt. n.1. The riot which Gundersen enthusiastically joined resulted in evacuations, vote count delays, officer injuries, and more than 2.8 million dollars in losses. Law enforcement officials from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters. Gundersen's presence as part of the mob, his repeated entries into the building itself,

18

his encouragement of other rioters to enter, and his forceful resistance to officers trying to clear the Capitol grounds required the unnecessary expenditure of substantial resources in the form of the police required to defend the Capitol and clear it of rioters.

**B.      THE APPLICABLE GUIDELINE FOR COUNT TWO IS §2A2.2**

Gundersen objects to the PSR's determination that the appropriate guideline for Count Two is §2A2.2. But because the PSR grouped Gundersen's assault conviction with his conviction for obstruction of justice, the PSR did not do a separate offense level calculation for Gundersen's assault conviction and did not address the applicability of the six-level enhancement. Therefore, absent a departure from the PSR's grouping analysis, the Court need not address Gundersen's argument.

But the PSR's determination is correct. Because Gundersen's assault was an "aggravated assault" as that term is defined by the Guidelines, any calculation of Gundersen's offense level must begin with § 2A2.2, which defines "aggravated assault" to include any felonious assault that involved "an intent to commit another felony."

Gundersen's assault was felonious. Section 111(a) authorizes punishment for an individual who "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title [*i.e.*, a federal officer] while engaged in or on account of the performance of official duties." 18 U.S.C. § 111(a)(1). A misdemeanor penalty is authorized where the individual's act "constitute[s] only simple assault." *Ibid*. But where the individual's "acts involve physical contact with the victim of that assault or the intent to commit another felony," he faces a term of imprisonment of "not more than 8 years." *Ibid*. Gundersen does not dispute the PSR's finding that the maximum penalty for his assault is eight years, and he has

admitted that his assault on Officer C.B. involved "physical contact." ECF No. 44, ¶ 40. Thus, his assault was felonious under § 111(a).

Gundersen's assault also involved "an intent to commit another felony." As discussed above, Gundersen's assault was not an isolated event, but rather part and parcel of his efforts to obstruct the certification of the election, in violation of 18 U.S.C. § 1512(c)(2). Defense counsel's characterization of the assault as "essentially an afterthought" is inconsistent with both the evidence and Gundersen's admission that his purpose on January 6 was to obstruct the certification of the election.

## C.   THE OFFICIAL VICTIM ENHANCEMENT APPLIES TO GUNDERSEN'S ASSAULT CONVICTION

On page 13 of his memo, Gundersen argues against the PSR's application of § 3A1.2's six-level enhancement for official victim to his assault conviction. Again, because the PSR did not do a separate offense level calculation for Gundersen's assault conviction, absent a departure from the PSR's grouping analysis, the Court need not address Gundersen's argument.

In any event, as noted in the government's sentencing memo, this enhancement clearly applies to Gundersen's assault conviction. Gundersen has admitted that he assaulted Officer C.B., an employee of an agency in a branch of the U.S. Government, while Officer C.B. was engaged in the performance of official duties. ECF No. 44, ¶ 40. And as discussed above, Gundersen's assault was not random – it was part and parcel of Gundersen's intent to subvert the election.

This Court has applied the official victim enhancement in previous §111(a) sentencings. In *United States v. Wilden*, 21-cr-423 (RC), the Gundersen pled guilty to §111(a) for spraying officers with pepper spray. The Court agreed with the application of the six-level official victim adjustment. *See* Sentencing Tr., at 8. More recently, in *Fitzsimons*, this Court overruled the

defendant's objection to application of this enhancement, dismissing as "ridiculous" the argument that Fitzsimons was not motivated by the officer's official positions. So here, Defense counsel's claim that Gundersen "acted impetuously and without thinking" is contrary to the evidence and Gundersen's social media posts claiming his violence was justified. Gundersen's conduct was clearly motivated by Officer C.B.'s official position -- Gundersen did not know Officer C.B. prior to January 6, and had no other reason to attack him.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052


BY:    _/s/   Robert Juman_____
        ROBERT JUMAN
        Assistant United States Attorney
        Bar No. NJ 033201993
        United States Attorney's Office, Detailee
        555 Fourth Street, N.W.
        Washington, DC 20530
        Phone: (786) 514-9990
        E-mail: Robert.juman@usdoj.gov